**Affirmed as Modified and Opinion Filed October 22, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01228-CR

### BRANDY MECHELLE HARRIS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the Criminal District Court No. 6
### Dallas County, Texas
### Trial Court Cause No. F-1300510-X

## MEMORANDUM OPINION

Before Justices Francis, Lang, and Brown
Opinion by Justice Francis

Following a bench trial, Brandy Mechelle Harris was convicted of theft of property valued at $1500 or more but less than $20,000. The trial court assessed punishment at two years in state jail, suspended sentence, and placed appellant on five years community supervision. In two issues, appellant challenges the sufficiency of the evidence to support her conviction and the adequacy of counsel's representation. In a cross-issue, the State requests we modify the judgment to reflect that appellant pleaded not guilty to the offense. We overrule appellant's issues and sustain the State's cross-issue. We modify the judgment as requested and affirm as modified.

Stephanie Elliott testified she met appellant through appellant's work at Tootsie's and BCBG, two apparel stores. Elliott was one of appellant's customers. During one of her visits to

BCBG, Elliott hired appellant to prepare a wardrobe book for her. The project entailed appellant going through Elliott's wardrobe and putting together different articles of Elliott's clothing, along with shoes, jewelry, and accessories, and photographing the ensemble.

Appellant went to Elliott's condominium four or five times to work on the book. Elliott lived in a controlled-access building, meaning that each time appellant came to her residence, Elliott had to go down a private elevator and exit to a secured door to let appellant in or out. Elliott said she had to use a key fob for entry and exit, and she had the only key fob.

While working on the book, appellant had "complete access" to Elliott's wardrobe, all her jewelry, "everything." Elliott said she kept her "precious stones," including a diamond and platinum tennis bracelet, in a locked jewelry box in her closet. She kept her "simpler pieces" in a drawer with jewelry trays.

During this time, Elliott noticed appellant wearing a costume jewelry bracelet that, "at first glance," looked real and "very similar" to Elliott's diamond and platinum tennis bracelet. Elliott commented on the bracelet, and appellant said it was a "little cheapy" and showed her that it had an elastic band. At some point, appellant commented on "how beautiful" Elliott's bracelet was.

Appellant's last day at Elliott's home was February 22, 2012, and she was wearing the elastic band bracelet. Elliott had a rule that guests could not wear shoes in her home. On that day, appellant told Elliott her feet were cold and asked to borrow a pair of socks. Elliott let appellant go to her closet to get a pair, but when it took longer than Elliott thought it should, she went to look for appellant. As Elliott went into the bedroom, appellant was coming out of the closet with the socks in her hands.

The two went to Elliott's sitting room, and appellant told Elliott she was in debt and needed to borrow money. She also said she needed more work and asked if Elliott could refer

–2–

her to some people. Elliott said appellant seemed to be "in a little bit of a hurry to leave," and she hugged her and told her she would see if she could find her other referral work.

On March 30, Elliott was in the process of packing her belongings so that she could move and noticed the lock on her jewelry box was broken. Although Elliott had been accessing the box in the previous weeks, she did not notice the lock had been tampered with until a small screw fell out. When she went through the box's contents, she discovered that her diamond and platinum bracelet was missing and appellant's elastic bracelet was in its place. Although Elliott generally wore the bracelet daily, she had not worn it in the time since appellant had last been at her house because she was in culinary school and was not allowed to wear jewelry.

Upon discovering the bracelet missing, Elliott said she began "rolodexing" how many people had been in her residence and had access to her closet. She determined it was only she, her cleaning lady, and appellant. Elliott said her cleaning lady had been with her for three years, and nothing had ever been stolen during that time. She also knew the elastic bracelet left in her jewelry box belonged to appellant, yet she said she quizzed her cleaning lady until she was in tears because she believed appellant was a "trusted friend."

On the same day that she discovered her bracelet missing, Elliott received an email from appellant saying she was $26,000 in debt and asking to borrow $13,000. Elliott told appellant she did not "give loans." A week later, Elliott went to BCBG and confronted appellant about the bracelet. The two went outside to talk, and appellant denied taking the bracelet. Elliott offered "several different scenarios" in which appellant could have innocently or accidentally taken the bracelet, and appellant said, "No, absolutely not." During their conversation, Elliott said appellant became "very theatrical" and loud. Ultimately, appellant agreed she would look for the bracelet and call Elliott back. Within a couple of days, appellant called Elliott and said she could not find the bracelet and suggested the cleaning lady stole it. Later that day, Elliott received a

text from appellant saying she had gotten a $7000 bonus from BCBG. According to Elliott, BCBG told her it does not give bonuses to employees.

On April 10, Elliott reported the theft to the police. By that time, she had moved from her condominium to another address. At trial, she testified she had a video of appellant in her closet on that last day going through the area of her jewelry box, but said she had lost it during her move. She also said she told the police about the video, but the police report did not mention a video.

Finally, other evidence was presented regarding the value of the bracelet. Elliott testified the bracelet was custom made for about $20,000, and she later added five diamonds to the clasp. Other evidence showed that, at the time of the theft, Elliott told the police its value was $12,000. Elliott's jeweler, who had been appraising jewelry for more than thirty years, testified the bracelet's value was "somewhat in excess of $30,000" and that it would cost approximately $40,000 to purchase it retail.

The indictment alleged the property taken was a bracelet with a value of at least $20,000 but less than $100,000. After hearing the evidence, the trial court found the bracelet's value was more than $1500 but less than $20,000 and found appellant guilty of state jail felony theft.

In her first issue, appellant contends the evidence is insufficient to support her conviction. In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the

combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* For purposes of proving guilt beyond a reasonable doubt, direct and circumstantial evidence are treated equally. *Id.*

A person commits theft if she unlawfully appropriates property with intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03(a) (West Supp. 2014). Appropriation of property is unlawful if it is without the owner's effective consent. *Id.* § 31.03(b)(1).

Here, appellant argues the evidence is insufficient because Elliott's testimony was "so riddled with contradictions, mistakes . . . and variances with normal human experience as to render the finding of guilt irrational." In particular, she argues (1) Elliott did not notice until March 30 that the lock on the jewelry box had been compromised; (2) although she claimed at trial to have had video evidence at one time, the police report did not mention any such evidence nor did the investigating officer recall Elliott telling him about a video; and (3) Elliott testified she paid $20,000 for the bracelet but told the police the bracelet was worth $12,000. She points to other "problems" with the evidence. She contends no fingerprint evidence connects the elastic bracelet to appellant. Also, she questions why Elliott would quiz her housekeeper to tears if she found the costume bracelet in her jewelry box, suggesting the costume bracelet was found elsewhere in the residence and put in the jewelry box by the housekeeper after she stole the bracelet. Finally, she argues Elliott's behavior was "suspect" because she did not immediately confront appellant even when appellant asked for a loan

Although appellant argues the above "problems" render the evidence legally insufficient, we cannot agree. First, we note, as did Elliott at trial, the theft occurred two and a half years earlier and Elliott was testifying based on her memory and recall of the event. While there may have been some inconsistencies on particular sequences of events or the value of the bracelet, the trial court was in the best position to resolve those inconsistencies and to judge Elliott's

credibility.  With that in mind, the evidence showed appellant was one of only two people, other than Elliott, who had access to Elliott's closet.  On her last day at Elliott's house, appellant was wearing the elastic band costume jewelry bracelet that looked "very similar" to Elliott's expensive diamond and platinum bracelet.  On that day, appellant took an excessive amount of time in Elliott's closet retrieving a pair of socks.  She also told Elliott she was in debt and needed money.  Weeks later, Elliott noticed for the first time that the lock on her jewelry box was broken and her diamond and platinum bracelet was missing; in its place was the costume bracelet worn by appellant.  Considering the evidence, we conclude the trial court could have rationally believed beyond a reasonable doubt that appellant stole Elliott's bracelet and left her own elastic bracelet in its place.  Further, the evidence was sufficient to show the value of the bracelet was $1500 or more but less than $20,000.  We overrule the first issue.

In her second issue, appellant argues she received ineffective assistance of counsel because counsel failed to adduce evidence she believed was important to her case and advised her not to testify.  To support her complaints, she relies on evidence adduced at a hearing held after her motion for new trial was overruled by operation of law.

A motion for new trial must be filed no more than thirty days after the date the trial court imposes the sentence.  TEX. R. APP. P. 21.4(a).  The trial court must rule on the motion within seventy-five days after imposing sentence; otherwise, the motion is deemed overruled by operation of law.  TEX. R. APP. P. 21.8(a), (c).  Once a motion for new trial is overruled by operation of law, the trial court is without jurisdiction to rule on the motion.  *State v. Garza*, 931 S.W.2d 560, 562 (Tex. Crim. App. 1996).  A hearing held after the trial court has lost jurisdiction to rule on the motion is not authorized and therefore will not be considered on appeal.  *Parmer v. State*, 38 S.W.3d 661, 667 (Tex. App.—Austin 2000, pet. ref'd).

–6–

In this case, the trial court imposed sentence on September 3, 2014. Appellant timely filed a motion for new trial thirty days later, or October 3, 2014. A hearing on the motion was set and reset several times. At a hearing on November 11, which was sixty-nine days after imposition of sentence, the State sought a final continuance so that all parties could be present, and appellant's counsel specifically stated he did not object. The trial court granted the continuance and did not conduct the hearing until November 21, which was four days after the motion was overruled by operation of law. Consequently, this Court cannot consider any evidence presented at the hearing.

To successfully assert an ineffective assistance of counsel challenge on direct appeal, an appellant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance prejudiced him; that is, but for the deficiency, there is a reasonable probability that the result of the proceeding would have been different. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). An ineffective assistance of counsel claim must be "firmly founded in the record," and the record must "affirmatively demonstrate" the claim has merit. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). We commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it. *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005).

Here, appellant's motion for new trial raised three ineffective assistance of counsel grounds: (1) trial counsel met with her only briefly and with insufficient consultation time to prepare a defense; (2) trial counsel would not permit her to testify even though she wished to testify and had relevant and material evidence to the guilt-innocence determination; and (3) trial counsel failed to impeach Elliott with material information that contradicted her trial testimony.

Appellant asserted the motion's resolution depended on facts not determinable from the record and an evidentiary hearing was required.

Because we cannot consider the evidence adduced at the new trial hearing, there is nothing in the record to support appellant's particular assertions of ineffective assistance. Under these circumstances, we therefore conclude she has not met her burden of overcoming the strong presumption of reasonable assistance required by *Strickland*. *See Rylander*, 101 S.W.3d at 110. We overrule the second issue.

In a cross-issue, the State asks us to modify the trial court's judgment to reflect that appellant pleaded not guilty to the offense. The record shows appellant pleaded not guilty to the offense, but the judgment shows she pleaded guilty. This Court has the authority to correct a judgment to make the record below "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the judgment to reflect a plea of not guilty to the offense.

We affirm the judgment as modified.

Do Not Publish
TEX. R. APP. P. 47.2(b)
141228F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BRANDY MECHELLE HARRIS,
Appellant

No. 05-14-01228-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 6, Dallas County, Texas
Trial Court Cause No. F-1300510-X.
Opinion delivered by Justice Francis;
Justices Lang and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect a Plea to Offense of Not Guilty.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered October 22, 2015.