COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TRACEY MAURICE CARTER, | § | |
| | | No. 08-07-00192-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 89th District Court |
| THE STATE OF TEXAS, | § | |
| | | of Wichita County, Texas |
| Appellee. | § | |
| | | (TC#45,347-C) |
| | § | |

**O P I N I O N**

Tracey Maurice Carter was indicted for Aggravated Robbery in Count I and Unlawful Possession of a Firearm in Count II. Carter was found guilty of both counts and the jury returned a verdict of true to the enhancement paragraphs of the indictment. Carter was sentenced to ninety-nine years in prison. Carter appeals his conviction on seven grounds. We affirm.

**FACTS**

James Riley sold papers for the Times Record News. On February 15, 2006 at 4:30 p.m. Riley was on the pay phone by Lucky's convenience store, talking to his girlfriend when Carter walked up with a gun pointed at him asking for "my money" and pulling the trigger. At the time he was saying that, Riley sat down on the sidewalk. Riley testified that after he sat down Carter continued to point the gun at him for five minutes. Riley also stated that he had never seen Carter before and that he did not know him.

Riley identified the gun that was used by Carter during the robbery. When asked whether he recognized it from some place in particular Riley answered "no." Although defense counsel

argued that Riley had already stated that he did not recognize the gun from some place in particular, the court allowed questioning about the handgun to continue and Riley testified that the gun was pointed at him by Carter. Riley also identified five loose bullets that Carter held in his left hand at the time of the robbery. Riley testified the bullets were in his left hand and the gun was in "the other hand." Glenda Christopher, Appellant's mother, testified that Appellant has always been left-handed. Riley testified that when Carter pulled the trigger the gun jammed. Carter did not appear frustrated or mad and he did not attempt to undo the jam. Riley thought that he was going to be shot and was shaking for three days after the incident.

Officer James Jackson testified that he was on duty that day and he received a call that a subject had pointed a gun at another subject. Shortly after the call Officer Jackson saw a man meeting the description given and another black man at a shop nearby. Officer Jackson approached the men and told them that he needed to talk to them. Carter was observed tossing something into a car with an open window. Officer Jackson instructed Carter to place his hands on his patrol car and Carter complied. When Officer Rosedahl arrived, Officer Jackson searched the car for what had been placed through the open window. Officer Jackson retrieved a lightweight gray jacket with a small Colt pistol in the right pocket. Jackson confirmed that when he found the pistol the slide was not in battery, meaning the slide was not fully forward on a loaded chamber. At trial, Officer Jackson also identified the gun and cartridges retrieved at the time of Carter's arrest.

Officer Greg Burt, a police officer for the City of Wichita Falls and an ATF task force officer, gave testimony regarding the operation of firearms, specifically double feeds and the serviceability of the gun in evidence. Officer Burt testified that the handgun in question was dirty and had broken parts. He went on to testify that dirty semi-automatic handguns do not function well. Officer Burt tested the handgun, and after several attempts he was finally able to get the handgun's hammer to

drop, which engaged the firing pin and detonated the primer in an empty shell casing.

Detective Chris Gay of the Wichita Falls Police Department Financial Crimes Unit testified as an expert in handwriting comparison. Detective Gay completed a one-week course offered by the University of Houston in handwriting comparison and completed two refresher courses. Detective Gay compared a handwriting sample provided by Appellant with the handwriting on State's Exhibit 11, a letter written by Appellant to the detectives. Based on similarities between the two writings, Detective Gay concluded that the two writings were authored by the same person. He also testified on cross-examination that handwriting comparison is subjective and is considered a soft science.

The Appellant called William Dixon. Dixon is Appellant's cousin, and was the other man present when Appellant was arrested. Prior to Appellant's arrest Dixon was driving in the area and saw Appellant walking not far from Lucky's. Dixon stopped his vehicle and got out to talk with Appellant. Dixon testified that Appellant did not appear nervous or frightened. They made plans to go somewhere and Appellant placed his jacket in Dixon's car. Dixon and Appellant spoke for a couple of minutes and they were about to get in the car when the police arrived. According to Dixon, Appellant did not react in any fashion to the presence of the police. Dixon also questioned whether the police officer would have been able to see Appellant put his jacket in the car. Dixon did not see the Colt handgun removed from Appellant's jacket, but a handgun was shown to him.

Linda McNair testified that when she arrived at Lucky's at around 4 p.m. on the afternoon of February 15, 2006, Riley was on the payphone outside of Lucky's and Appellant and another man were standing in the parking lot. McNair described the neighborhood around Lucky's as not pretty and she testified that its clientele included street people, prostitutes, and shoplifters. McNair went on to explain that she believed that the Appellant and Riley knew each other. Appellant followed McNair into Lucky's and began to buy a beer, and she refused the sale because she was worried

Appellant would loiter in the parking lot to drink the beverage. McNair saw him walk off in the direction of the location where he was arrested. McNair observed Riley get off the payphone, sit down on the curb, and after a few minutes he came into the store. McNair never saw Appellant near or around Riley.

When Riley entered the store he did not appear upset or frightened. Riley walked to the back of the store, got a drink, and approached the counter. Riley did not say anything until after he heard McNair complain about having to put up with panhandlers. After McNair mentioned the panhandlers Riley mentioned that he had been shown a gun. McNair asked if he had been robbed and Riley responded "[o]h, yeah, he robbed me." Before this Riley had not mentioned that he had been robbed at gunpoint and had not behaved in any way indicating that he had recently been threatened.

McNair called the police. They arrived within minutes and spoke with her and Riley. McNair stated that based upon what she knew and observed that day, she did not believe a robbery had taken place.

Officer Jackson, on rebuttal, stated that Appellant's cousin, Mr. Dixon, told him he was passing by and Appellant flagged him down to ask for a ride. Officer Jackson asked both Mr. Dixon and Appellant who owned the vehicle the jacket was found in, and both responded that they did not. Officer Jackson also testified that when he went to interview Riley at Lucky's he appeared visibly shaken.

## DISCUSSION

Appellant raises seven issues on appeal. In Issues One and Two Appellant argues that the evidence is both legally and factually insufficient to support the jury's verdict that Appellant was guilty of aggravated robbery. In Issues Three and Four Appellant argues that the evidence is legally

and factually insufficient to support the jury's verdict that Appellant unlawfully possessed a firearm. In Issue Five Appellant argues that the trial court erred in admitting State's Exhibit 11 because it was authenticated through improper "expert" opinion. In Issue Six Appellant agues that the trial court erred in admitting State's Exhibit 11 because it contained plea negotiations. In Issue Seven Appellant argues that he was denied reasonably effective counsel when his attorney failed to cross-examine the complainant.

## AGGRAVATED ROBBERY

### Legal Sufficiency of the Aggravated Robbery Conviction

In addressing legal sufficiency, we review all the evidence, both State and defense, in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *Geesa v. State*, 820 S.W.2d 154, 159 (Tex.Crim.App. 1991), *overruled on other grounds*, *Paulson v. State*, 28 S.W.3d 570 (Tex.Crim.App. 2000). We consider all of the evidence, whether admissible or inadmissible. *Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999); *Johnson v. State*, 967 S.W.2d 410, 412 (Tex.Crim.App. 1998). We do not resolve any conflict of fact or assign credibility to the witnesses, as it was the function of the trier of fact to do so. *See Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). Instead, our duty is only to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all of the evidence admitted at trial in a light most favorable to the verdict. *Adelman,* 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson*, 819 S.W.2d at 843. The standard of review is the same for both direct evidence and circumstantial evidence cases. *Geesa*, 820 S.W.2d at 158.

Under the legal sufficiency review, more than enough evidence exists to support the Appellant's aggravated robbery conviction. Riley's testimony standing on its own is legally sufficient. Riley testified that while he was on the payphone Carter "walked up and he had a gun pointed at me and he went, give me my money, and he – he pulled – he was pulling the trigger at the time he was saying that, then I sat down on the – on the sidewalk there and he stayed up for a little while and then he left." When viewing only the evidence that supports the verdict, Riley's testimony alone legally satisfies the verdict.

## Factual Sufficiency of the Aggravated Robbery Conviction

In reviewing factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). In performing our review, we are to give due deference to the fact finder's determinations. *See Johnson*, 23 S.W.3d at 8-9; *Clewis*, 922 S.W.2d at 136. The fact finder is the judge of the credibility of the witnesses and may "believe all, some, or none of the testimony." *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991). Evidence is factually insufficient if it is so weak that it would be clearly wrong and manifestly unjust to allow the verdict to stand, or the finding of guilt is against the great weight and preponderance of the available evidence. *Johnson*, 23 S.W.3d at 11. Thus, the question we must consider in conducting a factual sufficiency review is whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the fact finder's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *See id*.

In a factual sufficiency review we look at all the evidence in the record. While this Court agrees that some inconsistencies do exist, the evidence presented supports the jury's verdict and it

is not against the great weight and preponderance of the evidence.

Specifically, Appellant complains Riley originally testified that he first saw Appellant when he was on the phone but later said that he first saw Appellant when he got off the phone. Then he later stated that he was still on the phone when he turned and saw Appellant. Appellant argues that Riley's account of when he first saw Appellant is inconsistent. Appellant also argues that Riley's testimony indicating that Appellant was already pulling the trigger when he was asking for the money defies common sense because if Appellant intended to disable Riley by firepower there was no need to demand any money from Riley. Further, Appellant criticizes that during the robbery Riley just sat down. Appellant also criticizes Riley's account that after he sat down Appellant continued to point a gun at Riley for five minutes.

Appellant questions Riley's account of his behavior following the robbery. Riley testified that after the robbery he went inside Lucky's and bought a pop without mentioning that he had been robbed until he went to the cash register. Appellant points out that this is not the type of behavior associated with someone who has just been robbed at gun point. And not until McNair complained about loiterers did Riley offer that he had been shown a gun. Then when asked by McNair if he had been robbed he answered in the affirmative. McNair testified that she did not believe that Riley had been robbed.

When Riley was questioned about the firearm used in the robbery he was originally unable to identify the handgun shown to him as the one used when he was robbed. After more questioning he was eventually able to identify the handgun shown to him as the one used in the robbery against him. Moreover, Riley testified that Appellant held the handgun in his right hand and it was later shown Appellant was left-handed. Riley also testified that he saw Appellant in the back of a police car at Lucky's, which was later refuted by the arresting police officer who testified that Appellant

was arrested some distance from Lucky's and taken directly to jail.

Appellant has pointed out inconsistences in Riley's testimony and argues that Riley's testimony is both contradictory and unbelievable.  However, it is the job of the jury to weigh the evidence and choose which testimony to believe or not to believe.  *Chambers*, 805 S.W.2d at 461.  Appellate courts should afford almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.  The jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record.  *See Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006).  An appellate court must give deference to a jury's decision regarding what weight to give contradictory testimonial evidence because the decision is most likely based on an evaluation of credibility and demeanor, which the jury is in the better position to judge.  *Lancon v. State*, 253 S.W.3d 699, 706 (Tex.Crim.App. 2008).

Under the first prong of *Johnson*, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury.  Under the second prong of *Johnson*, we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict.  *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App. 2006).  Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson*, we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict.  *Id*.  We find no objective basis in the record to show that the jury's finding was against the great weight and preponderance of the evidence.  *Id*.  Appellant was found near the scene of the crime with a handgun that had a double feed.  A police officer testified that Riley appeared "shaken" and "upset" after the incident.  Most importantly, Riley said

he was robbed at gunpoint by Appellant. Lack of memory or conflicting testimony goes to the weight of the evidence, and the jury was permitted to believe that Appellant committed the robbery. Issues One and Two are overruled.

## UNLAWFUL POSSESSION OF A FIREARM

### Legal and Factual Sufficiency of the Unlawful Possession of a Firearm Conviction

Appellant argues that the jury was required to find beyond a reasonable doubt that the possession of the firearm occurred at a location other than where Appellant lived and that the State failed to prove the firearm was found somewhere other than where the Appellant lived. It can be inferred from the facts that the Appellant did not live where he was arrested.

It is unlawful for a felon to possess a firearm after conviction and before the fifth anniversary of his release from confinement "at any location other than the premises at which the person lives." TEX. PENAL CODE ANN. § 46.04(a)(2)(Vernon 2003). The evidence establishes that the Appellant was arrested at a public place not a residence. Nothing in the record indicates that Appellant lived in the parking lot where he was arrested, and the car in which the gun was found was owned by Appellant's cousin. If Appellant was homeless he would not be allowed to possess a firearm under Section 46.04(a)(2) because he would be without residential premises. In an apartment complex firearms must be kept within the confines of a residence, not in common areas. *Wilson v. State*, 418 S.W.2d 687, 688 (Tex.Crim.App. 1967). In keeping with *Wilson*, a homeless person would not be permitted to wander the streets with a firearm if a person with a home must keep the firearm within the premises of his residence. Appellant's position defies logic and common sense. Under the legal sufficiency review, the evidence supports the finding that the firearm was found somewhere other than where the Appellant lived. Under the factual sufficiency review, the evidence presented supports the jury's verdict and is not against the great weight and preponderance of the evidence.

Issues Three and Four are overruled.

## STATE'S EXHIBIT 11

In Issues Five and Six Appellant argues that State's Exhibit 11 should not have been admitted into evidence. First, Appellant argues that the exhibit was authenticated through improper expert opinion. Second, Appellant argues that the exhibit should not have been admitted because it contains plea negotiations.

State's Exhibit 11, a handwritten letter, reads as follows:

To: D/A OR Detectives

I will give you five drug dealers, some with guns and some with more than one controlled substance including in a school zone and also the place where I received my gun for exchange for my freedom. Please contact me at your earliest convenience.

Sincerely,
/s/ Tracey Carter

### Expert Testimony

Proof of handwriting by comparison is a method recognized by law. *In re Mateer's Estate*, 296 S.W. 907, 909 (Tex.Civ.App. 1927); *see also* TEX.CODE CRIM.PROC. ANN. art. 38.27 (Vernon 2005).

We review a trial court's decision to admit or exclude scientific expert testimony under an abuse of discretion standard. *Sexton v. State*, 93 S.W.3d 96, 99 (Tex.Crim.App. 2002); *see also Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000). If the trial court's ruling is within the zone of reasonable disagreement, then the trial court's ruling will be upheld. *Sexton*, 93 S.W.3d at 99.

Texas Rule of Evidence 702 states, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness

qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R.Evid. 702; *Sexton*, 93 S.W.3d at 99. The Court of Criminal Appeals has recognized that the threshold determination for a trial court to make regarding the admission of expert testimony is whether that testimony will help the trier of fact understand the evidence or determine a fact in issue. *Kelly v. State*, 824 S.W.2d 568, 572 (Tex.Crim.App. 1992). Thus, in a case such as this, where the trial court is faced with an offer of expert testimony on a scientific topic unfamiliar to lay jurors, the trial court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results. *Id*.

In *Kelly*, the Court of Criminal Appeals held, "[E]vidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Id*. at 573. Non-exclusive factors that could affect a trial court's determination of reliability include: "(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the expert(s) testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question." *Id*.

When expert testimony addresses fields of study aside from the hard sciences, such as the social studies or fields that are based primarily upon experience and training as opposed to the scientific method, however, the reliability standard set out in *Kelly* applies with less rigor. *Nenno*

*v. State*, 970 S.W.2d 549, 561 (Tex.Crim.App. 1998), *overruled on other grounds, State v. Terrazas*, 4 S.W.3d 720 (Tex.Crim.App. 1999); *Muhammad v. State*, 46 S.W.3d 493 (Tex.App.–El Paso 2001, no pet.).

In *Nenno*, the Court of Criminal Appeals stated that the appropriate questions for assessing reliability when addressing fields that are primarily based upon experience and training are: (1) whether the field of expertise is a legitimate one; (2) whether the subject matter of the expert's testimony is within the scope of the field; and (3) whether the expert's testimony properly relies upon or utilizes the principles involved in the field. *Nenno*, 970 S.W.2d at 561.

The Court is of the opinion that the *Nenno* standard should apply in handwriting comparison cases over the more rigorous *Kelly* standard. Handwriting comparison is not considered hard science. Rather, it is a soft science and subjective, which Detective Gay's testimony confirmed. Detective Gay attended a week-long course in basic handwriting comparison. He also attended two more courses. Detective Gay explained handwriting comparison is the comparison of a known document with a unknown document, which is done to authenticate the author's handwriting. Detective Gay explained that both state and federal courts have found handwriting comparison to be legitimate. He explained that adults have muscle memory when they write. And that based on his training and experience he looks for unique characteristics in the writing, which have developed over time, to determine if two writings were made by the same person. Handwriting comparison has been subjected to peer review. In the present case, the unique characteristics between the exemplar and Exhibit 11, were the separation between letters and the slant of the writing.

Based on the historically-accepted use of handwriting comparison by the legal community and the provisions of the Texas Code of Criminal Procedure for such comparisons, it is clear that handwriting comparison is a legitimate field. We find that Detective Gay's testimony about his

comparison was well within the scope of this field, and he relied upon and utilized the principles involved in the field. The trial court did not abuse its discretion is admitting State's Exhibit 11 into evidence. Issue Five is overruled.

## Plea Negotiations

In Issue Six Appellant contends that the trial court erred in admitting State's Exhibit 11 because the letter contained plea negotiations.

We review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard of review. *Prystash v. State*, 3 S.W.3d 522, 527 (Tex.Crim.App. 1999). In other words, the appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990). In addition, the appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made. *Hoyos v. State*, 982 S.W.2d 419, 422 (Tex.Crim.App. 1998); *Hardesty v. State*, 667 S.W.2d 130, 133 n.6 (Tex.Crim.App. 1984).

An abuse of discretion occurs when the trial court acts arbitrarily or unreasonably, without reference to guiding rules or principles. *Montgomery*, 810 S.W.2d at 380. A trial court's ruling on admissibility should not be disturbed under an abuse of discretion standard simply because we might decide a question differently from the trial judge. *West v. State*, 121 S.W.3d 95, 100 (Tex.App.–Fort Worth 2003, pet. ref'd) (citing *Montgomery*, 810 S.W.2d at 391).

Statements made during plea discussions "with an attorney for the prosecuting authority" that "do not result in a plea of guilty or a plea of *nolo contendere*" are not admissible against the defendant who made them. TEX.R.EVID. 410(4). State's Exhibit 11 was addressed to the detectives or the district attorney. The plain language of Rule 410(4) only applies to discussions with the prosecuting authority, not detectives. "Thus, purported plea offers or other statements to anyone

other than an attorney for the prosecution, . . ., are not covered by Rule 410, regardless of what the defendant believed when he made the statement in question." *Monreal v. State*, 947 S.W.2d 559, 565 (Tex.Crim.App. 1997) (citing S. Goode, et al., *Guide to the Texas Rules of Evidence: Civil and Criminal* § 410.3 at 282 (2nd ed.1993) (emphasis omitted)). Because Rule 410(4) is inapplicable in this situation, we find this argument unpersuasive. Issue Six is overruled.

**INEFFECTIVE ASSISTANCE OF COUNSEL**

In Issue Seven Appellant contends that he was denied reasonably effective counsel because his trial attorney failed to cross-examine the complainant.

Successful claims of ineffective assistance of counsel must first demonstrate that counsel was not functioning as counsel guaranteed by the Sixth Amendment in providing reasonably effective assistance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The second requirement is a showing that counsel's errors were so serious as to deprive Appellant of a fair trial, such that there arises a reasonable probability that but for counsel's unprofessional errors, the results would have been different. Reasonable probability is a likelihood sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Texas adopted this test in *Wilkerson v. State,* 726 S.W.2d 542, 548 (Tex.Crim.App. 1986). *See also McFarland v. State,* 845 S.W.2d 824, 842-43 (Tex.Crim.App. 1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). The constitutional right to counsel does not mean errorless representation. In order to meet the constitutional standard, counsel must provide reasonably effective assistance. *Wilkerson,* 726 S.W.2d at 548. In reviewing these assertions, the totality of representation is examined as opposed to focusing upon isolated acts or omissions. Ineffective assistance of counsel cannot be established by isolating or separating out one portion of the trial counsel's performance for examination. *Bridge v. State,* 726 S.W.2d 558, 571 (Tex.Crim.App. 1986). In that regard, this Court, on review, will not engage in hindsighted comparisons of how other counsel, in particular, appellate counsel, might have tried the case. *See Wilkerson,* 726 S.W.2d at 548. A fair assessment of trial counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances at trial, and to evaluate the conduct from counsel's perspective at the time. *Stafford v. State,* 813 S.W.2d 503, 506

(Tex.Crim.App. 1991). We must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance. The Appellant must overcome the presumption that under the circumstances at trial, the challenged action could be considered sound trial strategy. *Strickland,* 466 U.S. at 688-89, 104 S.Ct. at 2065; *Stafford,* 813 S.W.2d at 506. Consequently, allegations of ineffectiveness of counsel must be firmly founded by the record. *Hawkins v. State,* 660 S.W.2d 65, 75 (Tex.Crim.App. 1983); *Mercado v. State,* 615 S.W.2d 225, 228 (Tex.Crim.App. 1981). The burden is upon Appellant to establish ineffective assistance of counsel by a preponderance of the evidence. *Williams v. State*, 837 S.W.2d 759, 761 (Tex.App.–El Paso 1992, no pet.).

In most instances, the record on direct appeal is undeveloped and cannot adequately reflect the failings of trial counsel. *Thompson v. State,* 9 S.W.3d 808, 813-14 (Tex.Crim.App. 1999). A defendant may rebut the presumption of effectiveness by providing a record from which the appellate court may ascertain that trial counsel's performance was not based on sound trial strategy. *Parmer v. State,* 38 S.W.3d 661, 666 (Tex.App.–Austin 2000, pet. ref'd). A defendant may provide that record by filing a motion for new trial and obtaining a hearing thereon based on ineffective assistance of counsel. *Id.* Any error in trial strategy will be deemed inadequate representation only if counsel's actions are without any plausible basis. *Id.* A record that does not include any discernible explanation of the motivation behind trial counsel's actions fails to establish whether his or her actions were of strategic design or were the result of negligent conduct. *Thompson*, 9 S.W.3d at 813-14.

In this case the Court is presented with some explanation of why Appellant's trial counsel did not cross-examine the complainant. During closing arguments Appellant's trial counsel explained to the jury in the following way why he did not cross-examine Riley: "I did it for a reason and the reason is this is the first case I've seen where the State's witness–the witness they had to have, the witness–the only witness that could prove their case of aggravated robbery himself by his own testimony created a reasonable doubt. And I'm going to tell you how he did that." Appellant's trial counsel went on to go through the testimony of Riley, pointing out the inconsistencies and flaws. Appellant's trial counsel also pointed out that the purpose of cross-examination is to get facts that can be argued to the jury, which after analyzing all the facts within Riley's testimony, trial counsel determined was not necessary because enough evidence existed to make a coherent closing argument.

This Court finds trial counsel's explanation of the motivation for the strategy used persuasive. As has been pointed out by both this Court and Appellant himself, Riley's testimony is contradictory. In such a case, it is possible that a lengthy cross-examination would have caused more harm than good or that cross-examination would have allowed Riley to explain away the inconsistences of his testimony. Trial counsel's tactical decision falls within the wide range of reasonably professional assistance. It is not this Court's role to Monday-morning quarterback trial counsel by engaging in an endless "what if" hindsighted review. Most importantly, the Appellant has not shown that his attorney's tactical decision was without a plausible basis and that the result would have been different but for the failure to cross-examine Riley. *Parmer,* 38 S.W.3d at 666; *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. Issue Seven is overruled.

**CONCLUSION**

Having found that Appellant's issues are without merit, we affirm the judgment of the trial court.


GUADALUPE RIVERA, Justice

July 31, 2009

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)